UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BRENDA LANE,

        Plaintiff,

v.                                      Case No.  8:04-cv-654-T-24 TBM

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY, a
Connecticut Corporation,

        Defendant.

_____/

## ORDER

       This cause comes before the Court on the parties' motions for summary judgment (Doc. No. 43, 44).  These motions are opposed.  (Doc. No. 46, 49).

## I.  Standard of Review

       Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  A moving party discharges its burden on a motion for summary judgment by "showing" or "pointing out" to the Court that there is an absence of evidence to support the non-moving party's case.  Id. at 325.  When a moving party has discharged its burden, the non-moving party must then "go beyond the pleadings," and by its own affidavits, or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing there is a genuine issue for trial.  Id. at 324.

In determining whether the moving party has met its burden of establishing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor.  See Samples on behalf of Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988).  Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant the summary judgment motion. See Augusta Iron & Steel Works v. Employers Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988).

## II.  Background[1]

Plaintiff was a Nursing Assistant and Unit Coordinator at Lakeland Regional Medical Center.  (H423).  Plaintiff was insured under a Group Long Term Disability Insurance Policy ("the Policy"), for which Defendant is the claims administrator and the insurer.

The Policy provides:

Totally Disabled means: (1) during the Elimination Period; and (2) for the next 24 months, you are prevented by Disability from doing all the material and substantial duties of your own occupation.  After that, and for as long as you stay Totally Disabled, you are prevented by Disability from doing any occupation or work for which you are or could become qualified by: (1) training; (2) education; or (3) experience.

(H15[2]).  Eligibility for long term disability ("LTD") benefits is conditioned on the claimant providing Defendant with satisfactory proof of total disability.  (H16, 20).  A claimant who

---

[1]The Court has construed the facts in the light most favorable to Plaintiff.

[2]References to the Administrative Record (Doc. No. 45) are indicated by "H" followed by the page number.

receives LTD benefits has an ongoing responsibility to furnish proof of continued total disability. (H16).  LTD benefits cease when a claimant is no longer disabled or when a claimant fails to furnish proof of continued disability.  (H16).

In December of 1988, Plaintiff fell and fractured her left hip, necessitating a surgical reduction.  She had a total hip replacement surgery on her left hip in 1990, and then she had the hip surgery revised that same year.  In 1994, Plaintiff underwent total right knee replacement due to degenerative joint disease.  Plaintiff underwent revision of the right knee replacement in late 1998 or early 1999.

Plaintiff continued working until April of 1996, when she ceased working due to pain in her hip, knee, and back.  She applied for LTD benefits, which she began receiving on October 14, 1996.  (H307).  Plaintiff also applied for Social Security Disability benefits, which she has been receiving since 1998.

On April 18, 2000, Plaintiff was examined by Dr. William Cherry, an orthopedic surgeon who was Plaintiff's treating physician.  (H177).  In his treatment note from that visit, Dr. Cherry indicated that it was a follow-up visit regarding Plaintiff's right knee revision and that Plaintiff was extremely pleased with how it was doing.  (H177).  He also indicated that Plaintiff's knee was not hurting at all and that she was not having any problems with it.  (H177).  Additionally, he indicated that Plaintiff was having a slight amount of pain in her hip and buttocks, but it was not anything that Plaintiff could not handle.  (H177).

On May 24, 2001, Plaintiff had another follow-up visit with Dr. Cherry.  (H175).  In his treatment note, Dr. Cherry indicated that Plaintiff seemed to be doing rather well and that she was not having any particular problem.  (H175).  He also noted that Plaintiff had no further

injuries or problems with her hips and knees.  (H175).  After reviewing Plaintiff's x-rays, he indicated that Plaintiff had well-fixed total hip and total knee arthroplasties.  (H176).

From 2000 through early 2002, Plaintiff saw Dr. Lucido, a chiropractor, on almost a monthly basis, sometimes more than once a month.  (H.182-187).  Dr. Lucido's notes indicate that during these visits, Plaintiff continually complained of hip, back, leg, and knee pains.  (H182-187).

On April 1, 2002, Defendant received an Attending Physician's Statement of Continuing Disability and Physical Capacities Evaluation Form, completed in March of 2002 by Dr. Vincent Lucido.  (H192-194).  Dr. Lucido diagnosed Plaintiff as having sacroiliac dysfunction and thoracic pain, which caused recurrent low back and thoracic pain.  (H192).  In filling out the Physical Capacities Evaluation Form, he indicated that Plaintiff could only: (1) sit for one hour at a time, for up to five hours during the workday; (2) stand for a half hour at a time, for up to three hours during the workday; (3) walk for a half hour at a time, for up to two hours during the workday; and (4) drive for one hour at a time, for up to four hours during the workday.  (H194).  Furthermore, he indicated that Plaintiff could only work for a maximum of four hours per day.  (H194).  However, Dr. Lucido indicated that Plaintiff's mechanical dysfunction as a result of ligamentous instability associated with her previous injuries and left hip and right knee prostheses made it highly improbable that Plaintiff could assume any vocational responsibilities and that Plaintiff was not able to return to work, even in a lighter duty capacity.[3]  (H193).

_____

[3]Plaintiff also points out that in 1997 and 1998, Dr. Lucido opined that Plaintiff could not work.  (H. 167, 265, 226).  Specifically, in a letter dated December 2, 1997, Dr. Lucido stated: Plaintiff is not capable of any regular vocational activities.  There are days she could adequately perform sedentary clerical work, but they are sufficiently interspersed with days of incapacity that rule out holding down a job.  (H167).  However, no one appears to dispute that Plaintiff was

On June 11, 2002, Plaintiff was seen by Dr. Cherry.  (H156).  In his treatment note, Dr. Cherry indicated that Plaintiff continued to have some pain in her left groin, her left buttocks, and down her thigh to her proximal left calf.  (H156).  He indicated that Plaintiff had done extremely well until recently, when she began having more pain.  (H156).  However, he indicated that Plaintiff's x-rays did not show any significant positive findings and that Plaintiff maintained good range of motion, good strength around her hip, and overall, no outward problems indicating why she was feeling pain.  (H156).

On June 20, 2002, Plaintiff was seen by Dr. Cherry for another follow-up visit.  (H155).  In his treatment note, Dr. Cherry indicated that Plaintiff had been having pain in her groin and hip on the left side.  (H155).  He indicated that her pain was not any worse and that she did not have any other problems.  (H155).  After reviewing Plaintiff's bone scan, Dr. Cherry's assessment was "[p]robably mild to moderate polyethylene wear with synovitis left hip."  (H155).  He noted that if her condition worsened, at some point it might become worthwhile to do a procedure where the polyethylene cup could be replaced and the joint debrided.  (H155).

In November of 2002, as part of Defendant's ongoing evaluation of Plaintiff's eligibility for continuing benefits, Defendant arranged for an independent medical review by Medical Advisory Group LLC.  (H143-147).  The review was performed by Dr. Todd Lyon, a physician Board Certified in Family Practice, who reviewed Plaintiff's medical records and consulted with Dr. Cherry and Dr. Lucido by phone.[4]  (H143).

On November 14, 2002, Dr. Lyon spoke to Dr. Cherry about Plaintiff's medical

_____

unable to work in 1997 and 1998.

[4]Dr. Lyon did not examine Plaintiff.

condition.  (H145).  Dr. Lyon stated in his report that Dr. Cherry believed that Plaintiff had the capacity for full-time sedentary demand work.  (H146).

On November 18, 2002, Dr. Lyon spoke to Dr. Lucido about Plaintiff's medical condition.  (H146).  Dr. Lyon stated in his report that while Dr. Lucido expressed concerns about Plaintiff's ability to tolerate her discomfort while working, Dr. Lucido agreed that Plaintiff's medical condition did not contraindicate full-time sedentary work.  (H146).

After speaking with Dr. Cherry and Dr. Lucido, Dr. Lyon faxed Dr. Cherry and Dr. Lucido a letter summarizing their conversations.  (H148-151).  Dr. Lyon requested that Dr. Cherry and Dr. Lucido fax any corrections to him within five business days if they did not agree with his understanding of their conversations, as set forth in the letter faxed to each of them.  (H148-151).  Neither doctor faxed any corrections to Dr. Lyon.

After reviewing Plaintiff's medical records and speaking with Dr. Cherry and Dr. Lucido, Dr. Lyon issued a five page report, in which he concluded the following:

> [Plaintiff] would not likely have the capacity for full-time light demand work with no restrictions on her need for standing and walking.  It is my opinion, however, that the evidence is quite clear in this case that [Plaintiff] retains the capacity for full-time sedentary work and would have the capacity for short periods of ambulation and standing.

(H146-147).

Based on the capabilities and restrictions identified by Dr. Lyon, Defendant performed an Employability Analysis to determine if there were suitable occupations that Plaintiff was capable of performing.  (H134-141).  Defendant utilized the Occupational Access System, which is a computerized job matching system that cross-references an individual's capabilities and qualifications with 12,741 occupations classified by the U.S. Department of Labor's Dictionary

6

of Occupational Titles.  (H135).  The Employability Analysis identified three sedentary

occupations for Plaintiff in the medical/hospital setting: (1) Identification Clerk, (2) Hospital

Admitting Clerk, and (3) Animal Hospital Clerk.  (H135).

On December 12, 2002, Defendant sent Plaintiff a letter advising her of its determination

that she was ineligible for continued LTD benefits due to her ability to perform sedentary work.

(H91-95).  In this letter, Defendant informed Plaintiff that Dr. Lyon spoke with Dr. Cherry and

Dr. Lucido and that Dr. Cherry and Dr. Lucido agreed that Plaintiff had the capacity for full-time

sedentary work.  (H93, 94).  Defendant informed Plaintiff that since she had the skills to perform

the sedentary occupations of Identification Clerk, Hospital Admitting Clerk, and Animal

Hospital Clerk, Defendant was discontinuing her LTD payments effective December 16, 2002.

(H91, 94).

On April 8, 2003, Plaintiff exercised her right under the Policy to appeal the decision to

terminate her benefits.  (H99).  The appeal consisted of a one-page letter describing her medical

condition and stating that she was receiving Social Security Disability benefits since she was

considered totally disabled under the Social Security guidelines.  (H99).  Plaintiff did not submit

any additional medical evidence in connection with her appeal.  (H51).  On May 12, 2003,

Defendant denied Plaintiff's appeal and made its final determination that she was not entitled to

continued LTD payments.  (H51).

On June 23, 2003, after Defendant denied Plaintiff's appeal, Plaintiff sent Defendant a

letter enclosing a February 25, 2003 treatment note from Dr. Cherry, in which he indicated that

Plaintiff was having some aching in her left hip and right knee that gave her problems from a

daily basis to a more intermittent two to three times per week.  (H73, 74).  After a physical

examination, Dr. Cherry noted that Plaintiff had a little bit of pain with extreme motion, and he

indicated that she had significant osteoarthritis.  (H74).  As a result, Dr. Cherry concluded in the

treatment note that he thought that Plaintiff might be able to do occasional sedentary work, but

due to her arthritic condition involving multiple joints, he did not think that she was able to work

full-time and that she was not able to work every day, which might preclude her from being able

to work at all.  (H74).

On July 22, 2003, Defendant responded to Plaintiff that its final decision on her appeal

was made on May 12, 2003, and therefore, the administrative remedies provided by the Policy

had already been exhausted.  (H72).  Thereafter, Plaintiff filed the instant lawsuit to recover her

LTD benefits that were terminated.  (Doc. No. 19).

### III.  Standard of Review for ERISA Claims

The United States Supreme Court, in Firestone Tire & Rubber Co. v. Bruch, 489 U.S.

101, 115 (1989), set forth the standard of review that a court must apply when reviewing a denial

of ERISA benefits: "a denial of benefits . . . is to be reviewed under a *de novo* standard unless

the benefit plan gives the administrator or fiduciary discretionary authority to determine

eligibility for benefits or to construe the terms of the plan."  The Eleventh Circuit has adopted

three standards of review for plan interpretations: (1) *de novo*, applicable where the plan

administrator is not afforded discretion, (2) arbitrary and capricious, applicable where the plan

grants the administrator discretion, and (3) heightened arbitrary and capricious, applicable where

the plan grants the administrator discretion and there is a conflict of interest.  See Paramore v.

Delta Air Lines, Inc., 129 F.3d 1446, 1449 (11th Cir. 1997).

This Court has previously found that the heightened arbitrary and capricious standard of

review applies in this case, because (1) Defendant is given discretion under the Policy to determine eligibility for benefits, and (2) Defendant suffers from a conflict of interest, because it is both the claims administrator and insurer of the Policy.  (Doc. No. 31).  The heightened arbitrary and capricious standard applies to both Defendant's factual determinations and to Defendant's interpretations of the Policy.  See Torres v. Pittston Co., 346 F.3d 1324, 1329 (11th Cir. 2003).

Initially, the Court must evaluate Defendant's decision from the perspective of a *de novo* review and determine whether it is "wrong."  See HCA Health Services of Georgia, Inc. v. Employers Health Ins. Co., 240 F.3d 982, 993 (11th Cir. 2001).  A decision is "wrong" if, after reviewing the administrative record that was before the claims administrator at the time that the decision was made, the Court disagrees with Defendant's decision.  See id. at 993 n.23. If the Court determines that Defendant's decision was not wrong, the Court's inquiry ends and summary judgment is entered in favor of Defendant.  Williams v. BellSouth Telecommunications, Inc., 373 F.3d 1132, 1138 (11th Cir. 2004).  If, however, the Court determines that Defendant's decision is wrong, the Court must determine whether Defendant's decision is reasonable.  See HCA Health, 240 F.3d at 994.

Since Defendant suffers from a conflict of interest, Defendant's decision is not necessarily entitled to deference if the Court determines that Defendant's decision is wrong, but reasonable.  See id.  Instead, under the heightened arbitrary and capricious standard of review, the burden shifts to Defendant to prove that its decision is not tainted by self-interest.  See id. Defendant can satisfy this burden by showing that its wrong but reasonable decision benefits the class of participants and beneficiaries.  See id. at 994-95.  Even if Defendant satisfies this

burden, Plaintiff may still be successful if she can show by other measures that Defendant's decision was arbitrary and capricious.  See id. at 995.  If the Court finds that Defendant fails to show that its decision benefits the class of participants and beneficiaries, Defendant's decision will not be entitled to deference.  See id.

## IV.  Defendant's Motion for Summary Judgment

Defendant argues that it is entitled to summary judgment on Plaintiff's claims, because its decision to terminate Plaintiff's LTD benefits was not wrong.  Plaintiff asserts several arguments in support of her contention that Defendant's decision was both wrong and unreasonable.  For the reasons stated below, the Court rejects Plaintiff's arguments and finds that Defendant's decision was not wrong, and as such, its motion for summary judgment must be granted.

### A.  Plaintiff's Medical Condition

Plaintiff argues that Defendant's decision to terminate her LTD benefits was wrong, because Plaintiff has been diagnosed with a severe degenerative condition that requires her to obtain treatment from Dr. Cherry and Dr. Lucido on a regular basis and which continually causes her to experience symptoms and pain.  As such, Plaintiff argues that since Defendant has not shown that Plaintiff's condition has improved since she began receiving LTD benefits, its decision to terminate her benefits was wrong.  The Court, however, rejects these arguments.

The fact that Plaintiff has had hip and knee replacement surgeries and has been diagnosed with a severe degenerative condition does not, by itself, show that Plaintiff is unable to work, because a "diagnosis does not by itself establish disability."  Jordan v. Northrop Grumman Corp. Welfare Benefit Plan, 370 F.3d 869, 880 (9th Cir. 2003); see also Leahy v. Raytheon Co., 315

F.3d 11, 14, 19 (1st Cir. 2002)(affirming the administrator's determination that the claimant who

had undergone three hip replacements and two knee replacements was not fully disabled);

Abromitis v. Continental Cas. Co./CNA Ins. Companies, No. 03-2425, 2004 WL 2491367, at *1,

4 (4th Cir. Nov. 5, 2004)(affirming the administrator's decision to terminate the claimants

benefits based on her orthopedist's opinion that she was capable of sedentary work after her

fourth hip replacement surgery).  Instead, Plaintiff must show that her medical condition

rendered her unable to work in any occupation in which she was or could become qualified.  See

Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 526 (1st Cir. 2005).   As explained in more

detail in sections IV-B through IV-F below, Plaintiff has not met her burden.

        Additionally, the Court notes that the burden remains on Plaintiff to show that she

continues to be entitled to LTD benefits.  See Horton v. Reliance Standard Life Ins. Co., 141

F.3d 1038, 1040 (11th Cir. 1998); Richards v. Hartford Life & Accident Ins. Co., 356 F. Supp.2d

1278, 1284 (S.D. Fla. 2004)(citing Hufford v. Harris Corp., 322 F. Supp.2d 1345, 1360 (M.D.

Fla. 2004)).  Furthermore, as explained in more detail in sections IV-B through IV-F below, the

Court notes that the evidence in the administrative record that existed at the time that the initial

and final determinations were made shows that Defendant was not wrong in determining that

Plaintiff was not totally disabled from any occupation in which she was or could become

qualified.

        **B.  Dr. Cherry and Dr. Lucido's Failure to Respond to Dr. Lyon's Faxes**

        Next, Plaintiff argues that Defendant's decision to terminate her LTD benefits was

wrong, because it was based on Dr. Cherry and Dr. Lucido's failure to respond to Dr. Lyon's

faxes.  Thus, Plaintiff argues that it was wrong for Defendant to construe their silence as

agreeing that Plaintiff was capable of performing sedentary work.  The Court, however, rejects this argument.

Dr. Lyon reviewed Plaintiff's medical records and consulted with Dr. Cherry and Dr. Lucido by phone in November of 2002.  Dr. Lyon stated in his report that Dr. Cherry stated that Plaintiff had the capacity for full-time sedentary demand work.  Dr. Lyon stated in his report that while Dr. Lucido expressed concerns about Plaintiff's ability to tolerate her discomfort while working, Dr. Lucido agreed that Plaintiff's medical condition did not contraindicate full-time sedentary work.

After speaking with Dr. Cherry and Dr. Lucido, Dr. Lyon faxed Dr. Cherry and Dr. Lucido a letter summarizing their conversations.  Dr. Lyon requested that Dr. Cherry and Dr. Lucido fax any corrections to him within five business days if they did not agree with his understanding of their conversations, as set forth in the letter faxed to each of them.  Neither doctor faxed any corrections to Dr. Lyon.

Plaintiff argues that it was wrong of Defendant to construe Dr. Cherry and Dr. Lucido's silence as agreeing that Plaintiff was capable of sedentary work.  Specifically, Plaintiff argues that it was unreasonable to expect these doctors to contact Dr. Lyon to express their disagreement if they disagreed with his understanding, and Defendant was wrong for not following up with these doctors to make sure that they received the faxes and that they agreed with Dr. Lyon's understanding of their conversations.  These arguments, however, have no merit.

To begin with, Dr. Lyon was not required to send follow-up faxes to these doctors explaining his understanding of their conversations.  Furthermore, it is not unreasonable to

expect these doctors to contact Dr. Lyon to express their disagreement if they disagreed with Dr. Lyon's understanding.  While Plaintiff points out that Dr. Cherry failed to respond to repeated requests for documentation regarding her disability in 1997 (H265), this does not show that he ignored Dr. Lyon's fax in 2002.

Furthermore, assuming arguendo that it was unreasonable to expect these doctors to contact Dr. Lyon to express their disagreement if they disagreed with Dr. Lyon's understanding, Plaintiff was on notice in December of 2002 when she received the initial termination decision that Defendant based its termination decision on these doctors telling Dr. Lyon that they believed that Plaintiff was capable of sedentary work.  If these doctors did not in fact state this to Dr. Lyon, Plaintiff could have submitted statements from these doctors with her appeal contradicting Dr. Lyon's understanding of their conversations; however, Plaintiff did not do this. Furthermore, to date, Plaintiff has not submitted any statements from these doctors stating that they did not tell Dr. Lyon that Plaintiff was capable of sedentary work.  As such, there is no reason to assume that Dr. Lyon's report setting forth his understanding of his conversations with Dr. Cherry and Dr. Lucido that they agreed that Plaintiff was capable of sedentary work was not accurate.  Additionally, the Court notes that Plaintiff cites no authority for her argument that Defendant should have followed up with Dr. Cherry and Dr. Lucido to confirm that they told Dr. Lyon that Plaintiff was capable of sedentary work.

Furthermore, the Court notes that this is not a situation in which Dr. Lyon had no previous contact with these doctors and then faxed them letters stating that it was his belief that Plaintiff was capable of full-time sedentary work and that if they did not respond contradicting his belief, then he would assume that they agreed.  Instead, this is a situation in which Dr. Lyon

13

spoke with these doctors, he reported his understanding that they agreed that Plaintiff was capable of sedentary work based on their conversations with him, and he sent them faxes confirming what he understood to be their stated opinion of Plaintiff's capacity to work. Plaintiff has not shown that Dr. Lyon's statement of his understanding of Dr. Cherry and Dr. Lucido's opinions that Plaintiff was capable of sedentary work was inaccurate.

### C.  Dr. Lucido's March 2002 Reports

Next, Plaintiff argues that Defendant's decision to terminate her LTD benefits was wrong, because Dr. Lucido's March 2002 reports showed that Plaintiff was totally disabled. Specifically, on April 1, 2002, Defendant received an Attending Physician's Statement of Continuing Disability and Physical Capacities Evaluation Form, completed in March of 2002 by Dr. Lucido.  In these reports, Dr. Lucido diagnosed Plaintiff as having sacroiliac dysfunction and thoracic pain, which caused recurrent low back and thoracic pain.  Additionally, Dr. Lucido stated that Plaintiff's mechanical dysfunction as a result of ligamentous instability associated with her previous injuries and left hip and right knee prostheses made it highly improbable that Plaintiff could assume any vocational responsibilities and that Plaintiff was not able to return to work, even in a lighter duty capacity.  As such, Plaintiff argues that given Dr. Lucido's opinion in March of 2002 that Plaintiff could not work, it does not stand to reason that Dr. Lucido would change his opinion when talking to Dr. Lyon in November of 2002.  Therefore, Plaintiff argues that it was wrong for Defendant to construe Dr. Lucido's silence in response to Dr. Lyon's fax regarding their November 2002 conversation as agreement that Plaintiff was capable of performing full-time sedentary work.  The Court, however, rejects this argument.

A logical conclusion can be drawn from the differences between Dr. Lucido's March

2002 and November 2002 opinions regarding Plaintiff's ability to work–Dr. Lucido may have changed his opinion and found that Plaintiff's medical condition no longer prevented her from doing sedentary work.  Again, Plaintiff has not submitted any evidence to Defendant or to the Court showing that Dr. Lucido believes that Dr. Lyon misunderstood their November 2002 conversation or that Dr. Lucido did not state during that conversation that Plaintiff was capable of performing sedentary work.  As such, the Court will not presume that because Dr. Lucido found that Plaintiff was unable to work in March of 2002 that her condition and/or his opinion could not have changed eight months later in November of 2002.

Furthermore, even if Dr. Lucido's opinion did not change and he still believed that Plaintiff was unable to work, the evidence in the administrative record that existed at the time that the initial and final determinations were made showed that Dr. Cherry and Dr. Lyon both concluded that Plaintiff was capable of performing sedentary work.  If such were the case, Defendant would have been entitled to choose an apparently more reliable source of information since the sources conflicted.  See Brown v. Blue Cross & Blue Shield of Florida, 898 F.2d 1556, 1572 (11th Cir. 1990).  As such, it would not be wrong for Defendant to consider Dr. Cherry (Plaintiff's treating doctor and orthopedic surgeon) and Dr. Lyon's concurring opinions as more reliable than Dr. Lucido's opinion, since Dr. Lucido's opinion was somewhat contradictory (since he stated in his March 2002 reports that Plaintiff could sit, stand, walk, and drive for limited periods of time and could work for a maximum of four hours per day, yet at the same time he also stated that it was highly improbable that Plaintiff could assume any vocational responsibilities).

**D.  Dr. Cherry's February 25, 2003 Treatment Note**

Next, Plaintiff argues that Defendant's decision to terminate her LTD benefits was wrong, because Dr. Cherry concluded in his February 25, 2003 treatment note that he thought that Plaintiff might be able to do occasional sedentary work, but due to her arthritic condition involving multiple joints, he did not think that she was able to work full-time and that she was not able to work every day, which might preclude her from being able to work at all.  As such, Plaintiff argues that this shows that Plaintiff was not able to perform full-time sedentary work, and it negates any inference that Dr. Cherry told Dr. Lyon in November of 2002 that he believed that Plaintiff could perform full-time sedentary work.  The Court, however, rejects these arguments.

To begin with, the Court cannot consider Dr. Cherry's February 25, 2003 treatment note, since it was not part of the administrative record at the time that Defendant made its initial or final termination decisions, since Plaintiff did not submit it until June of 2003.[5]  See Lee v. Blue Cross/Blue Shield of Alabama, 10 F.3d 1547, 1550 (11th Cir. 1994)(stating that the court is required to look only to the facts known to the administrator at the time that the decision was made to deny coverage); Richards, 356 F. Supp.2d at 1285 (stating that in order to show that a decision was wrong, the plaintiff must demonstrate that the administrative record *as it existed at the time of the decision to deny benefits* contained evidence demonstrating the plaintiff's inability to work); Carnaghi v. Phoenix American Life Ins. Co., 238 F. Supp.2d 1373, 1377

---

[5]Defendant made its initial termination decision on December 12, 2002 and its final decision denying Plaintiff's appeal on May 12, 2003.  Plaintiff did not submit Dr. Cherry's February 25, 2003 treatment note until June 23, 2003.  The Court finds that it was not wrong for Defendant to choose not to reopen Plaintiff's claim file to consider Dr. Cherry's February 25, 2003 treatment note after it had rendered its final decision denying Plaintiff's appeal, since Plaintiff could have submitted it when she appealed Defendant's decision on April 8, 2003, but she failed to do so.

16

(N.D. Ga. 2002)(refusing to consider additional evidence submitted to the plan administrator after the administrator rendered its final decision).

Furthermore, even if the Court could consider Dr. Cherry's February 25, 2003 treatment note, it would not establish that Dr. Cherry did not tell Dr. Lyon in November of 2002 that he believed that Plaintiff could perform full-time sedentary work.  Instead, the February 25, 2003 treatment note only shows that Dr. Cherry changed his opinion from the one that he gave Dr. Lyon in November of 2002.  Again, the Court notes that Plaintiff has not submitted any evidence to the Court showing that Dr. Cherry believes that Dr. Lyon misunderstood their November 2002 conversation or that Dr. Cherry did not state during that conversation that Plaintiff was capable of performing sedentary work.

### E.  Dr. Lyon's Opinion

Next, Plaintiff argues that Defendant's decision to terminate her LTD benefits was wrong, because Dr. Lyon's opinion was not reliable.  Specifically, Plaintiff argues that Defendant could not rely on Dr. Lyon's opinion because (1) he was a family practice doctor, (2) he only did a paper review of Plaintiff's medical records, (3) he did not independently diagnose Plaintiff's condition, (4) he did not disagree with Plaintiff's diagnoses by her treating physicians.  However, for the reasons stated below, the Court rejects these arguments.

Plaintiff argues that the Court could should not credit Dr. Lyon's opinion because he was a family practice doctor, not an orthopedic surgeon.  Plaintiff, however, cites no authority to support her argument on this issue.

Next, Plaintiff argues that the Court should not credit Dr. Lyon's opinion because he only did a paper review of Plaintiff's medical records and did not examine her, and as such, the Court

should give more weight to the opinions of Dr. Cherry and Dr. Lucido.  The Court rejects this

argument, because "[i]t is entirely appropriate for an administrator to rely on written reports of

consultants who have done paper reviews of a claimant's medical records."  Hufford, 322 F.

Supp.2d at 1359.  Furthermore, "plan administrators are not required to give special deference to

the opinions of treating physicians."  Id. at 1358-59 (citing Black & Decker Disability Plan v.

Nord, 538 U.S. 822, 825 (2003)).

Next Plaintiff argues that the Court should not credit Dr. Lyon's opinion because he did

not independently diagnose Plaintiff's condition.  Plaintiff cites McGill v. Unum Provident

Corp., 04-1586, 2005 U.S. Dist. LEXIS 6604 (E.D. La. April 12, 2005), in support of her

argument.  However, McGill is distinguishable.

In McGill, the plaintiff was diagnosed with fibromyalgia, and her three treating doctors

concluded that she was not capable of performing her job.  See id. at *3, 10.  The plaintiff argued

that the defendant erroneously denied her appeal for long term disability benefits on the basis of

the opinions of its in-house doctors.  See id. at *10-11.  The court found that the defendant

abused its discretion and stated:

> Although the administrator can normally rely on doctors who have only reviewed
> the claimant's medical records, in this case, [the defendant's] in-house doctors did
> not make any independent diagnosis of the Plaintiff's condition.  Instead, the in-
> house physicians merely took issue with the diagnosis provided by the Plaintiff's
> treating physicians. . . . Considering the Plaintiff's treating physicians' reports and
> the functional capacity evaluation, it was unreasonable for [the defendant] to rely
> so heavily on the conclusions of it's in-house physicians who base their
> determinations on their own suspicions regarding the treating physicians' reasons
> for diagnosing the Plaintiff with Fibromyalgia.

Id. at *21-22.

In the instant case, however, Defendant's reviewing doctor, Dr. Lyon, spoke with

Plaintiff's treating doctors, and *they all agreed* that Plaintiff's medical condition did not prevent her from doing sedentary work.  It does not appear that Dr. Lyon disputed Dr. Cherry and Dr. Lucido's diagnoses, since Dr. Lyon did acknowledge in his report that Plaintiff would not likely have the capacity for full-time light demand work with no restrictions on her need for standing and walking.

Next, Plaintiff argues that the Court should not credit Dr. Lyon's opinion, because he did not disagree with Plaintiff's diagnoses by her treating physicians of significant osteoarthritis, sacroiliac dysfunction, thoracic pain, and left hip thoracic bursitis.  As previously stated, a diagnosis does not establish disability, and the relevant inquiry is whether Plaintiff's medical condition prevents her from working.  Dr. Lyon consulted with Dr. Cherry and Dr. Lucido, and they agreed that Plaintiff's medical condition did not prevent her from doing sedentary work.

## F.  Social Security Disability Benefits

Next, Plaintiff argues that Defendant's decision to terminate her LTD benefits was wrong, because Plaintiff has been receiving Social Security Disability benefits since 1998.  As such, Plaintiff argues that Defendant should have given this fact more weight in its determination of whether Plaintiff was totally disabled.  The Court rejects this argument.

While the Court can consider the award of benefits by the Social Security Administration in reviewing Defendant's decision, the award is not dispositive of the issue of whether Plaintiff is disabled under the Policy.  See Paramore, 129 F.3d at 1452 n.5.  This is because there are "critical differences between the Social Security disability program and ERISA benefit plans." Nord, 538 U.S. at 832.  However, even after considering the award of Social Security Disability benefits, the Court finds that Plaintiff has not shown that she was totally disabled under the terms

of the Policy, since the evidence in the administrative record that existed at the time that the

initial and final determinations were made shows that Plaintiff was not totally disabled from any

occupation in which she was or could become qualified.

**V.  Conclusion**

       Accordingly, it is ORDERED AND ADJUDGED that:

(1)     Defendant's Motion for Summary Judgment (Doc. No. 44) is **GRANTED**;

(2)     Plaintiff's Motion for Summary Judgment (Doc. No. 43) is **DENIED**; and

(3)     The Clerk is directed to enter judgment in favor of Defendant and close this case.

**DONE AND ORDERED** at Tampa, Florida, this 7th day of November, 2005.

SUSAN C. BUCKLEW
United States District Judge

Copies to:
Counsel of Record